IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

QUITO I. NEHEMIAH,

      Plaintiff,

v.                                                                    No. 1:24-cv-00929-MLG-LF

DIRECTOR OF THE OFFICE OF
PERSONNEL MANAGEMENT,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on defendant Director of the Office of Personnel Management's ("OPM") Motion to Dismiss (Doc. 48).  United States District Judge Matthew Garcia referred this case to me under 28 U.S.C. § 636(b)(1)(B), (b)(3), and *Virginia Beach Federal Savings & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir. 1990) "to perform any legal analysis required to recommend to the Court an ultimate disposition of the case."  Doc. 70. Having reviewed the briefings, the law, and being otherwise fully advised, I recommend that the Court grant OPM's motion to dismiss.  Specifically, I recommend that the Court find that Mr. Nehemiah has abandoned his review of the MSPB decision, and that this matter should proceed solely as an employment discrimination case.  I further recommend that the Court dismiss Mr. Nehemiah's Title VII discrimination claim, Title VII retaliation claim, and Rehabilitation Act claim without prejudice.  Finally, I recommend that the Court provide Mr. Nehemiah thirty days to move the Court for leave to file an amended complaint.

## BACKGROUND

This is an employment dispute filed by plaintiff Quito Nehemiah, whose employment with the United States Department of Veterans Affairs ("VA") was terminated after he was accused of falsifying his application for employment. Doc. 80-2 at 1084–88. The United States Office of Personnel Management ("OPM") directed the VA to terminate Mr. Nehemiah's employment and barred him from federal employment for three years. *Id.* at 1086–88. Mr. Nehemiah's removal became effective May 5, 2023. *Id.* at 1088.

Mr. Nehemiah appealed OPM's decision to the United States Merit Systems Protection Board ("MSPB"), raising as affirmative defenses race- and gender-based discrimination, disability-based discrimination, and reprisal for prior protected activity. *Id.* at 1097. The MSPB affirmed OPM's decision and rejected Mr. Nehemiah's discrimination and reprisal claims. *Id.* at 1090–1102. Mr. Nehemiah appealed the MSPB's decision to the United States Court of Appeals for the Federal Circuit, which transferred the case to this Court after finding that Mr. Nehemiah had brought a "mixed case" that could only be heard in federal district court.[1] Doc. 2 at 2.

After the case was transferred to this Court, the "entire [389-page] Federal Circuit docket was placed on this Court's docket as a Complaint," and Mr. Nehemiah proceeded to file numerous motions and other documents, including three previous motions for summary judgment. Doc. 32 at 2 (internal quotations omitted); *see* Docs. 14, 15, 22. After determining that the record did not contain a formal petition asserting the claims and legal theories that Mr. Nehemiah wished to raise in this matter, the Court ordered (1) Mr. Nehemiah to file a formal petition setting forth all claims for relief that he intended to raise by February 14, 2025, Doc. 32

---

[1] As explained further below, a "mixed case" arises where the plaintiff complains of an adverse personnel action, such as a termination of employment, and also alleges that the action was based on discrimination. *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 422 (2017).

at 2–3, and (2) OPM to file a response to Mr. Nehemiah's petition by April 7, 2025, Doc. 39 at 1–2. Mr. Nehemiah timely filed a petition on February 3, 2025, *see* Doc. 37, although he also later filed additional petitions and claims for relief without leave of the Court, *see* Docs. 41, 56, 58–59, 65, 71–72, 84–85. OPM moved for an extension of time to respond to Mr. Nehemiah's petition, which Mr. Nehemiah did not oppose, and the Court permitted OPM to file its response by May 1, 2025. *See* Docs. 46, 47. OPM then timely filed its Motion to Dismiss for Failure to State a Claim (Doc. 48) on May 1, 2025, Mr. Nehemiah filed a response on May 16 (Doc. 49), and OPM filed a reply in support of its motion on May 29 (Doc. 50).[2]

## ANALYSIS

OPM sets forth two arguments for dismissing the petition: (1) that Mr. Nehemiah has abandoned any right to appeal the MSPB decision by not raising those claims in his petition; and (2) that Mr. Nehemiah's petition fails to state any discrimination claim upon which relief may granted. I address each argument in turn.

**I.    Mr. Nehemiah has abandoned his appeal of the MSPB decision, and this case should proceed solely on Mr. Nehemiah's discrimination claims.**

The Civil Service Reform Act of 1978 ("CSRA") provides certain procedures through which federal employees may appeal serious adverse employment actions, such as termination from federal service. *See Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 422–23 (2017). Serious adverse employment actions may be appealed to the Merit Systems Protection Board ("MSPB"). *Id.* at 422. If the employee disagrees with the MSPB's decision, the employee's path to judicial review of that decision depends on the types of claims the employee asserts. An employee that

---

[2] Mr. Nehemiah also filed a surreply (Doc. 53) and three supplements to that surreply (Docs. 53, 54–55, 56). As clearly stated in this District's local rules, "[t]he filing of a surreply requires leave of the Court." D.N.M.LR-Civ. 7.4(b). Because Mr. Nehemiah did not seek leave to file a surreply, I will not consider his surreply nor any of its supplements in analyzing this motion.

asserts only claims under the CSRA may seek judicial review exclusively in the United States Court of Appeals for the Federal Circuit. *Id.*; 5 U.S.C. § 7703(b)(1). However, if "an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination," the employee has brought a "mixed case" involving claims under both the CSRA and federal antidiscrimination laws. *Perry*, 582 U.S. at 424 (internal quotations omitted). When the MSPB dismisses a mixed case on the merits, procedural grounds, or for lack of jurisdiction, judicial review of that decision may be sought only in federal district court rather than the Federal Circuit. *Id.* at 426, 434–37; *see also Kloeckner v. Solis*, 568 U.S. 41, 56 (2012) ("A federal employee who claims that an agency action appealable to the MSPB violates an antidiscrimination statute . . . should seek judicial review in district court, not in the Federal Circuit.").

Once a mixed case arrives at the district court, the court's standard of review depends on the nature of the claims asserted: discrimination claims are reviewed de novo while non-discrimination claims are reviewed on the administrative record. 5 U.S.C. § 7703(c); *Williams v. Rice*, 983 F.2d 177, 179–80 (10th Cir. 1993). A petition for review of a MSPB decision on non-discrimination claims filed in federal district court is subject to the Federal Rules of Appellate Procedure governing review or enforcement of an order of an administrative agency, board, commission, or officer. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) ("Reviews of agency action in the district courts must be processed as *appeals*. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."); *Bussey v. Carter*, No. 1:16-cv-906-MCA-LF, 2018 WL 1684317, at *2 (D.N.M. Apr. 5, 2018) (applying Federal Rules of Appellate Procedure 16 and 17 to a non-discriminatory claim presented as part of a mixed case); FED. R. APP. P. 15–20. Federal Rule of

Appellate Procedure 15 specifies that a petition for review must "specify the order or part thereof to be reviewed." FED. R. APP. P. 15(a)(2)(C). While noting that "a mistaken or inexact specification of the order to be reviewed is not fatal," mere "bare references" mentioning an order "fall short of giving timely notice [that the petitioner] is seeking review of that order" pursuant to Rule 15. *See Ogunbode v. Barr*, 780 F. App'x 628, 633 (10th Cir. 2019) (quoting *Am. Rivers v. FERC*, 895 F.3d 32, 44 (D.C. Cir. 2018)).

In his appeal of his termination of federal employment to the MSPB, Mr. Nehemiah raised both claims under the CSRA and claims of discrimination, thus bringing a mixed case before the MSPB. Doc. 80-2 at 1088, 1097; *see Perry*, 582 U.S. at 422. The MSPB decided against Mr. Nehemiah on the merits, affirming OPM's negative suitability determination. Doc. 80-2 at 1102. Because the MSPB ruled against Mr. Nehemiah in a mixed case on the merits, the proper path for judicial review of the MSPB's decision is in federal district court. *See Perry*, 582 U.S. at 426; 5 U.S.C. § 7703(b)(2). Mr. Nehemiah instead filed a petition for review of the MSPB decision in the U.S. Court of Appeals for the Federal Circuit. Doc. 2 at 2. The Federal Circuit determined that Mr. Nehemiah brought a mixed case and that it thus lacked jurisdiction over his appeal. *Id.* The Federal Circuit therefore transferred Mr. Nehemiah's case to this Court pursuant to 28 U.S.C. § 1631. *Id.*

OPM argues that any appeal of the MSPB decision should be dismissed because Mr. Nehemiah abandoned any claim to appeal by not making such claims in his petition. Doc. 48 at 6–8. OPM notes that the petition "does not mention the MSPB or its decision, nor allege that it should be reversed," nor does it raise any of the three standards for reversing the decision. *Id.* at 7; Doc. 50 at 2; *see* 5 U.S.C. § 7703(c) (setting forth the three standards upon which the administrative record shall be reviewed). In his response, Mr. Nehemiah states only that he "did

appeal to the Merit protection Board they did not properly weigh the evidence and consider the plaintiff affirmative defense." Doc. 49 at 3. OPM replies that this is just a statement of the procedural history of the case and that Mr. Nehemiah "does not actually argue that he is seeking to appeal the MSPB Decision." Doc. 50 at 1. The only other reference Mr. Nehemiah makes to the MSPB is a general statement unconnected to any of the facts or procedural history of this case: "The plaintiff has the option of not appealing an unfavorable Merit Systems Protection Board (MSPB). If the agency doesn't petition the MSPB for review (called a Petition for Review or PFR), the employee can directly appeal to the U.S. Court of Appeals for the Federal Circuit." Doc. 49 at 4.

Although difficult to follow, a careful review of Mr. Nehemiah's petition reveals that it does not reference the MSPB's decision to affirm OPM's negative suitability determination at all, appearing to attack the underlying negative suitability determination rather than the MSPB proceedings affirming it. *See generally* Doc. 37. Mr. Nehemiah briefly references the MSPB's decision in his response to OPM's motion, stating that the MSPB "did not properly weigh the evidence" nor "consider [his] affirmative defense," Doc. 49 at 3, but that is his only reference to the decision; the remainder of the response is dedicated to his discrimination claims. Mr. Nehemiah nowhere clearly responds to OPM's argument that he has abandoned his appeal. He does not cite to the administrative record at all in his response to OPM's motion,[3] let alone clearly state that he is appealing the decision or on what specific grounds.

Although Mr. Nehemiah filed a Petition for Review that addressed the MSPB proceedings when he first filed this action with the Federal Circuit, Doc. 1 at 14–17; 52–62, he

---

[3] Mr. Nehemiah does not assert that he never received the administrative record, and OPM states that it served the record on Mr. Nehemiah. Doc. 45 at 1.

did not renew these claims in the operative petition in which he was ordered to "set[] forth all claims for relief that he intends to raise in this matter," Doc. 32 at 2.  The bare reference to the MSPB's decision in his response to OPM's motion, especially compared to the length of Mr. Nehemiah's discussion of his discrimination claims, supports the view that Mr. Nehemiah has abandoned his appeal of the MSPB's decision and is instead "solely pursuing a discrimination claim based on OPM's underlying suitability determination."  Doc. 50 at 1; *see Ogunbode*, 780 F. App'x at 633 (finding a "bare reference" to an order insufficient to petition for review of that order under FED. R. APP. P. 15(a)).  I therefore recommend that the Court find that Mr. Nehemiah has abandoned any appeal of the MSPB's decision of his non-discrimination claims and proceed solely on Mr. Nehemiah's discrimination claims.

## II.    Mr. Nehemiah has not stated plausible claims of retaliation or discrimination.

OPM next argues that Mr. Nehemiah's claims of discrimination and retaliation must be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Doc. 48 at 9–12.  Whereas the non-discrimination claims in a mixed case are reviewed on the administrative record, courts review discrimination claims de novo. *Williams*, 983 F.2d at 179–80; *Bobelu-Boone v. Wilkie*, 526 F. Supp. 3d 971, 983–84 (D.N.M. 2021) (evaluating a mixed case's discrimination claim under FED. R. CIV. P. 12(b)(6)).

Under Rule 12(b)(6), courts accept all well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff.  *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019) (quoting *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007)).  However, courts must "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).  Although a complaint need not contain

"detailed factual allegations," it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  Moreover, if factual allegations in a complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Khalik*, 671 F.3d at 1191 (internal quotations omitted).

Mr. Nehemiah is proceeding pro se in this matter.  In analyzing pro se filings under Rule 12(b)(6), courts liberally construe the factual allegations.  *See Northington v. Jackson*, 973 F.2d 1518, 1520–21 (10th Cir. 1992); *Hall v. Bellmon*, 935 F.2d 1106, 1100 & n.3 (10th Cir. 1991) ("[I]f the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.").  But a pro se litigant's pleadings still are judged by the same legal standards that apply to all litigants, and pro se litigants are not excused from following the applicable rules of court.  *Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994).  Although a pro se litigant may face a disadvantage against opponents represented by counsel, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant."  *Hall*, 935 F.2d at 1100; *see also Whitney v. New Mexico.*, 113 F.3d 1170, 1175 (10th Cir. 1997) (providing that a court should "not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf").

In deciding a Rule 12(b)(6) motion, courts focus on the plaintiff's operative pleading and generally may not consider evidence outside the pleadings.  *Alvardo*, 493 F.3d at 1215–16.  But "[i]t is well-established that district courts may take judicial notice of, and consider, documents

in the administrative record on a Rule 12(b)(6) motion to dismiss." *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 867 n.10 (10th Cir. 2023). In the present case, Mr. Nehemiah was ordered to file "a formal petition asserting the claims and legal theories that he wishes to raise in this case." Doc. 32 at 2. Mr. Nehemiah timely filed that petition on February 3, 2025, and that is the pleading that OPM was ordered to respond to. Doc. 39 at 1–2. However, after the Court issued its Case Management Order (Doc. 39), Mr. Nehemiah continued to file subsequent pleadings without the Court's permission: another petition on February 10 (Doc. 41), three filings entitled "Claim of Relief" (Docs. 56, 58, 59), a Petition for Damages (Doc. 65), two "Answer and Affirmative Defenses" (Docs. 71–72), and two Cross Complaints (Docs. 84–85). I will disregard these filings for the purposes of analyzing the motion to dismiss and only consider the first petition, Mr. Nehemiah's response to OPM's motion, and the administrative record.

Because a motion to dismiss depends on the sufficiency of the facts alleged in the plaintiff's pleading, those facts will preface further discussion. Mr. Nehemiah's twenty-page, single-spaced, 880-line petition asserts numerous facts, which are summarized as follows.[4]

### A. Mr. Nehemiah's petition

Mr. Nehemiah first worked for the federal government through a work-study program while attending the University of Arizona. Doc. 37 at 1. As part of the work-study program, Mr. Nehemiah worked at the Tucson VA Medical Center and worked in a different role each semester: "Library assistant, Mailroom clerk, Medical records specialist and administrator, and Volunteer services." *Id.*

---

[4] As OPM correctly points out, the "Factual Background" section (Doc. 37 at 10–19, lines 428–839) of Mr. Nehemiah's petition is identical to his "Introduction" section (*id.* at 1–10, lines 15–426). Doc. 48 at 7 n.4.

Sometime after—"the petitioner is not sure of the exact dates"—Mr. Nehemiah again worked for the federal government after being hired as a statistical clerk with the U.S. Census Bureau. *Id.* at 7. While working as a statistical clerk, he applied for an opening for a statistician but was not extended an interview. *Id.* He later discovered that the position was given to a "White female that did not have a college Diploma and 24 hours of statistics," despite the position requiring a bachelor's degree. *Id.* He wrote two congressmen and contacted the Equal Employment Opportunity Commission (EEOC), and the Census Bureau closed the position. *Id.* Mr. Nehemiah then resigned from his position at the Census Bureau. *Id.*

Years later, Mr. Nehemiah would again apply to work at the Census Bureau as a statistician. *Id.* He attended "a mass interview" with "hundreds of people white people and four black people." *Id.* He interviewed with "a Black female," and when he later inquired about his application, he was told that "he was not selected because he did not meet the minimum qualifications." *Id.* Mr. Nehemiah then contacted the EEOC and an attorney, and states that "[i]t was determined that the United States Census had discrimination against [him] based on his race and gender and agreed to a settlement for $ 5,000.00 Dollars and [to] hire [him] as a statistical clerk." *Id.*

After he was hired again with the Census Bureau, Mr. Nehemiah states that he was subjected to harassment by human resources. *Id.* He states that someone in human resources would not accept his social security card or his driver's license as two forms of identification, but that a human resources manager intervened and ensured they were accepted. *Id.* at 7–8. He states that human resources then placed him in a new position that he did not apply for so that "they could over scrutinize his movement." *Id.* at 8. He states he was placed "in a big open room surrounding him with twenty white employees all related all from Indiana," and was

supervised by "a Black Supervisor over all of these white folks put in place by human resources to give the harassment legitimacy." *Id.* Mr. Nehemiah asserts that he was written up for trivial reasons, such as for leaving the work area when he only went to a water fountain in the same room or after being excused to use the restroom; for being late when he was standing but not sitting at his desk when work began; and for sleeping at his desk when it only looked like he was sleeping because he is tall and must look down at his computer. *Id.*

Mr. Nehemiah asserts that the harassment was so intense that he told a staff nurse that he was having difficulty with concentrating and falling asleep, was feeling irritable and having aggressive outbursts, nightmares, upsetting dreams, and distressing memories about the Census Bureau. *Id.* Mr. Nehemiah contends that the harassment had nothing to do with work, but rather "white folks who did not invest in themselves educationally or served their Country in the Military or any other way." *Id.* Mr. Nehemiah states that the harassment was so intense that he decided to resign. *Id.* at 9. Before making that decision, he requested reasonable accommodations, but those requests were ignored. *Id.* Before he could resign, however, he was notified that his employment with the Census Bureau was being terminated. *Id.* Mr. Nehemiah states that the experience was so traumatic that "it never happened in [his] mind he just could not remember."[5] *Id.*

Sometime later, Mr. Nehemiah again applied to work for the federal government through the USAJOBs website.[6] *Id.* at 1. Mr. Nehemiah asserts that the website allowed him to save five

---

[5] Mr. Nehemiah does not provide any dates in his petition, but the administrative record states that Mr. Nehemiah's employment at the Census Bureau was terminated on November 6, 2018. Doc. 80-2 at 1085.

[6] The administrative record states that Mr. Nehemiah began applying for positions in 2021. Doc. 80-2 at 1085–86.

resumes on it, and that he followed instructions to list any experience that relates to the positions he applied for. *Id.* He was first offered and accepted a position as a Medical Support Assistant at the GS-6 level in Salt Lake City, Utah, but he rejected the offer after being involved in a car accident on the way to Salt Lake City. *Id.* at 1–2. Months later, he received a call about a position in Newington, Connecticut that took him by surprise because he "sent out so many resumes he did not remember applying for the position." *Id.* at 2. Mr. Nehemiah also states that he did not remember which resume he had submitted in his application. *Id.* After interviewing, Mr. Nehemiah was offered and accepted the position as a medical records clerk at the GS-4 level, but because he had previously worked at the GS-5 level, he felt that "human resources was excited to get **a sucker to accept the position**." *Id.* (emphasis in original).

Mr. Nehemiah then asserts that "[t]hrough search, experimentation and help from the Union [he] uncovered that" the VA and human resources were illegally discriminating against Black men and Puerto Ricans. *Id.* at 3. He then emailed "the Chief of VISN 1 and to all of his managers and the Chief of Human Resources and to all of his manager stating that they are being sued by [Mr. Nehemiah] for discrimination by Race and Gender in employment."[7] *Id.* Mr. Nehemiah asserts that he contacted the EEOC, and that human resources agreed to mediation. *Id.* Mr. Nehemiah states that "mediation was a disaster," and he began applying to other positions within the VA. *Id.* He eventually received an offer to work as a Medical Support at the GS-6 level in Boston, Massachusetts. *Id.* at 4. He was asked to provide a SF-50 form showing that he had previously worked at the GS-5 level, but Mr. Nehemiah only possessed an SF-50

---

[7] Mr. Nehemiah does not provide the date he sent this email, but a copy of the email in the administrative record reflects that it was sent on June 8, 2022. Doc. 80-2 at 398–99. "VISN" refers to a "Veterans Integrated Services Network," which is part of the VA. Doc. 48 at 11, n.6. VISN 1 includes Maine, Vermont, New Hampshire, Massachusetts, Connecticut, and Rhode Island. *See* https://www.va.gov/HEALTH/visns.asp (last visited 2/9/2026).

showing that he had worked at the GS-4 level. *Id.* The job offer was later rescinded, though no explanation was provided for why. *Id.*

Mr. Nehemiah then applied for the position of Transportation Specialist at the GS-6 level in Newington, Connecticut. *Id.* He was never extended an interview, and when he asked the recruiter why, he was told that he had failed to provide a current SF-50 form. *Id.* Mr. Nehemiah contends that this exchange "is the point where the discrimination based on Race, Gender, Color, Veteran status and the incompetence of the recruiter occurred." *Id.* Mr. Nehemiah replied that he had provided the SF-50 for his current position at the GS-4 level, but the recruiter replied that he needed a SF-50 showing that he had worked at the GS-5 level at any point in his career. *Id.* Mr. Nehemiah asked whether he was expected to provide two different SF-50 forms despite the job qualifications not specifying so, and the recruiter said yes. *Id.* Mr. Nehemiah told the recruiter that he is a veteran, that he worked at the GS-5 level for three years, and that he had previously been offered a GS-6 level position in Salt Lake City. *Id.* Mr. Nehemiah then asserts that a "white female" was selected for the position despite not having a college degree, not being a veteran, and previously working "in the coffee shop." *Id.* Mr. Nehemiah contends that this is because the VA and OPM are "dominated by white female employees on every level of management," and because they ignore qualified Black male and Puerto Rican veterans "by picking apart with laser focus their resumes to discriminate against them based on race and gender" while emphasizing "the most negligible qualifications of their white female counterpart in order to qualify them for a position they are not qualified to hold." *Id.*

Mr. Nehemiah then applied to and was accepted for a role as a Transportation Specialist at the GS-5 level in Miami, Florida. *Id.* However, he then received an offer for a transportation position in Albuquerque, New Mexico and accepted. *Id.* About two weeks after starting his new

position in Albuquerque, Mr. Nehemiah and his supervisor were told to report to human resources. *Id.* at 4–5. There, the human resources director handed Mr. Nehemiah an envelope containing a letter notifying him about allegations that he had falsified his resume and stating he had 30 days to respond or be terminated. *Id.* at 5. Mr. Nehemiah believes he received this notice in retaliation for previously contacting the EEOC. *Id.*

Mr. Nehemiah contests the allegation that he falsified his resume and contends that it was a mistake rather than an intentional act. *See id.* at 3, 5–7. He states that he had five resumes saved in USAJOBs "and he was editing copying, cutting and pasting from each one of them simultaneously and the cut and paste probably pasted the prior information the petitioner copying and pasting instead of the intended information the petitioner wanted." *Id.* at 3. Therefore, "[t]he cut and paste did not work and the dates and other information were save[d] and released on the incorrect resume." *Id.* Mr. Nehemiah faults the VA and OPM for not doing their due diligence in evaluating his resume, because the error was obvious: "The petitioner has not live[d] in Louisville, KY for twenty four years so the Petitioner could not have work[ed] for the VA hospital as Medical record administrator for twenty four years[,] it [is] not humanly possible." *Id.* He contends that clarification could have been obtained at any time and that human resources "could have asked [him] to explain the situation during the first week of employment not two years later." *Id.* He asserts that the falsification allegation is "a clear, cautious and unadulterated schematic (sic) of retaliation." *Id.*

In addition to asserting that the incorrect information appeared on his resume because of copy and paste errors, Mr. Nehemiah asserts that he genuinely did not remember being terminated from the Census Bureau when he certified that he had not been fired from employment in the last five years. *Id.* at 6. Mr. Nehemiah contends that, at the time he certified

that everything in his application was accurate, he "was struggling with long term Dyslexia, PTSD and Brain Trauma," and "as a result [he] membered (sic) what his mind allowed him to remember." *Id.* He states that if he could have remembered his termination from the Census Bureau, "he would have answered yes and explained the situation," but that he "[a]nswered NO because he could not recall or remember the event or situation." *Id.* at 7. Mr. Nehemiah asserts that he is being penalized for his disability. *Id.*

Upon this factual basis, Mr. Nehemiah seeks remedies for employment discrimination under Title VII of the Civil Rights Act of 1964 and the Americans with Disability Act. *Id.* at 19. He requests that OPM pay him compensatory damages and that he be reinstated as a Medical Support Assistant at the GS-6 level.[8] *Id.* at 1, 19–20.

### B. Relevant Facts from the Administrative Record.

In addition to the above facts alleged in Mr. Nehemiah's petition, the Court should also consider the following relevant facts from the administrative record. On June 7, 2008, Mr. Nehemiah transferred from the Census Bureau to the VA. Doc. 80-2 at 1085. Mr. Nehemiah worked with the VA until he resigned on August 26, 2011. *Id.* On April 30, 2018, he was employed again with the Census Bureau, but his employment was terminated on November 6, 2018. *Id.* Mr. Nehemiah applied for a file clerk position with the VA in September 2021 and received a career-conditional appointment on October 24, 2021. *Id.* at 1085–86.

---

[8] Mr. Nehemiah provides different amounts for the damages he is seeking at different points in his petition. He first states that OPM should pay him "$140.000.00" for lost wages and "$260.000.00 dollars in compensatory damages." Doc. 37 at 1. Later he states that he should receive "$100.000.00 dollars at 20% interest damages **(Back Pay at 20% interest)**, Punitive damages, in the amount of $100.000.00 dollars." *Id.* at 19 (emphasis in original). He then states that he "is seeking 500.000. 00 dollars monetary compensation." *Id.* at 20.

On January 10, 2022, the VA referred Mr. Nehemiah's case to OPM for government-wide debarment, and OPM assumed jurisdiction over the case on March 16, 2022. *Id.* at 1087. On August 28, 2022, Mr. Nehemiah was promoted from File Clerk at the GS-4 level to Transportation Assistant at the GS-5 level. *Id.* On September 25, 2022, his appointment was converted to a career-conditional appointment. *Id.* On October 5, 2022, OPM notified Mr. Nehemiah of its allegations that (1) his resume contained false statements about his work experience, and (2) that he had twice falsely certified that he had not been previously terminated from federal employment. *Id.* at 1087–88. Mr. Nehemiah submitted two responses to those allegations, and OPM issued a final determination letter on April 27, 2023, finding him unsuitable for federal service based on "material, intentional false statement, or deception or fraud in examination or appointment." *Id.* at 1088. OPM "directed the VA to separate him from its rolls, cancel all eligibility for reinstatement to the VA or any covered position, and debar him from any covered position for three years." *Id.* Mr. Nehemiah's termination of employment with the VA became effective May 5, 2023. *Id.*

C. Mr. Nehemiah has not stated a plausible claim for Title VII discrimination.

Title VII of the Civil Rights Act of 1964 "makes it unlawful to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Khalik*, 671 F.3d at 1192 (internal quotations omitted). A plaintiff may prove a violation of Title VII through direct evidence of discrimination or circumstantial evidence established through a burden-shifting framework. *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1137 (10th Cir. 2024) (citing *Khalik*, 671 F.3d at 1192)). Upon considering a Rule 12(b)(6) motion to dismiss, a court need only determine whether the plaintiff has sufficiently

stated a claim for relief under Title VII "by plausibly alleging either direct evidence of discrimination or a prima facie discrimination claim." *Id.* at 1137–38.

Direct evidence of discrimination proves the existence of a fact in issue without inference or presumption; statements that require an inference that discrimination motivated an employment decision are at most circumstantial evidence. *Id.* at 1137. Direct evidence of discrimination is "evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status," such as an employer's policy that is discriminatory on its face. *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008).

Circumstantial evidence of discriminatory intent may be established through application of the three-step *McDonnell Douglas* analysis, which first requires the plaintiff to prove a prima facie case of discrimination.[9] *McNellis*, F.4th at 1137. The *McDonnell Douglas* framework "does not create a pleading requirement," and "a plaintiff need not conclusively *prove* a violation of Title VII" to survive a 12(b)(6) motion to dismiss. *Id.* (internal quotations omitted). Generally, a prima facie discrimination claim requires a plaintiff to plausibly allege that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the challenged action occurred under circumstances giving rise to an inference of discrimination.[10]

---

[9] Should the plaintiff clear this first step, the burden then shifts to the defendant to provide a "legitimate, non-discriminatory reason for the adverse employment action." *McNellis*, 116 F.4th at 1137 (quoting *Barlow v. C.R. Eng., Inc.*, 703 F.3d 497, 505 (10th Cir. 2012)). If the defendant clears the second step, the burden finally shifts back to the plaintiff to prove that his protected status was a determinative factor in the defendant's employment decision or that the defendant's explanation is pretextual. *Id.*

[10] While stating this general rule, the U.S. Court of Appeals for the Tenth Circuit noted that "the precise requirements of a prima facie [discrimination] case can vary depending on the context." *McNellis*, 116 F.4th at 1139 (alteration in original). However, the "critical prima facie inquiry in all cases is whether the plaintiff has [alleged] that [an] adverse employment action occurred

*Id.* at 1139.  While a plaintiff need not plead any specific facts in particular, "a plaintiff must include enough context and detail to link the allegedly adverse employment action to a discriminatory or retaliatory motive with something besides sheer speculation."  *Bekkem v. Wilkie*, 915 F.3d 1258, 1274–75 (10th Cir. 2019) (internal quotations omitted).

A liberal reading of Mr. Nehemiah's petition suggests that he is attempting to allege that OPM discriminated against him on the basis of race, gender, color, and possibly his status as a veteran in violation of Title VII.[11]  As a preliminary matter, veteran status is not a protected class under Title VII and thus Mr. Nehemiah's claim of discrimination on that basis necessarily fails.  *See* 28 U.S.C. § 2000e-2(a) (listing protected classes as "race, color, religion, sex, or national origin"); *Khalik*, 671 F.3d at 1189 n.1 (noting that a plaintiff's "claim for relief based on 'ethnic heritage' discrimination necessarily fails because 'ethnic heritage' is not a protected class under Title VII").

Mr. Nehemiah's petition fails to detail with sufficient particularity how OPM discriminated against him.  Although Mr. Nehemiah has alleged that he is a member of a protected class—"an Indigenous Black United States citizen," Doc. 37 at 8, and he alleges he was terminated, *id.* at 5, which presumably was based on OPM's directive, Mr. Nehemiah fails to plausibly allege circumstances giving rise to an inference of discrimination.  Mr. Nehemiah relates several points at which he believes he was discriminated against during his years working for the federal government, but he fails to state what OPM did to him that gives rise to any

---

under circumstances which give rise to an inference of unlawful discrimination."  *Id.* (alterations in original) (quoting *Barlow*, 703 F.3d at 505).

[11] Mr. Nehemiah does not specify these bases in his claims for relief, merely "asserting a claim under Title VII of the Civil Rights Act of 1964."  Doc. 37 at 19.  However, he provides these bases earlier in the petition.  *See id.* at 4 (stating "[t]his is the point where the discrimination based on Race, Gender, Color, Veteran status . . . occurred," and that "Human Resources . . . was practicing systemic discrimination based on Race and Gender").

inference of discrimination. There is no suggestion that OPM treated other people who were not members of a protected class more favorably than him, nor does he allege any direct evidence of discrimination. Mr. Nehemiah also does not cite a facially discriminatory policy as the reason for OPM's actions against him. *See Sanders*, 544 F.3d at 1105. Thus, Mr. Nehemiah has failed to plausibly allege a claim of Title VII discrimination by OPM, and I recommend that the Court dismiss Mr. Nehemiah's Title VII discrimination claim without prejudice.

D.  Mr. Nehemiah has not stated a plausible Title VII claim of retaliation.

Title VII also prohibits employers from retaliating against employees for opposing unlawful discrimination. 42 U.S.C. § 2000e-3(a); *McNellis*, 116 F.4th at 1142. For a Title VII retaliation claim to survive a 12(b)(6) motion to dismiss, the plaintiff must plausibly allege "(1) that she [or he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *McNellis*, 116 F.4th at 1142 (quoting *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021)).

To plead the first element of a Title VII retaliation claim, plaintiffs "need not establish that the conduct [they] opposed actually violated Title VII," but "only that [they] had both a subjective good faith and objectively reasonable belief that it did." *Reznik*, 18 F.4th at 1260. Protected opposition "can range from filing formal charges to voicing informal complaints to superiors." *Equal Emp. Opportunity Comm'n v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007) (finding that an employee's statement to a supervisor that she was thinking of reporting discrimination to the EEOC "falls comfortably" into the category of protected opposition).

Mr. Nehemiah refers to several instances where he opposed what he believed to be unlawful discrimination over the course of his employment with the federal government. During

19

his first term of employment with the Census Bureau, Mr. Nehemiah describes writing to two

congressmen and contacting the EEOC about the Census Bureau's discrimination. Doc. 37 at 7.

After not being selected for a second term of employment with the Census Bureau, Mr.

Nehemiah describes again contacting the EEOC, which he states resulted in a determination that

the Census Bureau had discriminated against him and a $5,000 settlement. *Id.* Finally, during

his term of employment with the VA, Mr. Nehemiah describes emailing "the Chief of VISN 1,"

"all of his managers," "the Chief of Human Resources," and "all of his manager" to tell them he

was suing them for employment discrimination on the basis of race and gender. *Id.* at 3. He

further states that he again contacted the EEOC, resulting in mediation that ultimately was

unsuccessful. *Id.* Mr. Nehemiah thus may have adequately pled that he engaged in protected

opposition to discrimination.

To plead the second element of his retaliation claim, a plaintiff must show "that a

reasonable employee would have found the challenged action materially adverse—that is, that

the action might dissuade a reasonable worker from making or supporting a charge of

discrimination." *Id.* at 803 (citation modified) (quoting *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53 (2006)). Here, the action Mr. Nehemiah is challenging is OPM's negative

suitability determination. *See* Doc. 37 at 3. OPM argues that Mr. Nehemiah "never actually

alleges that OPM's negative suitability determination . . . was discrimination or taken in

retaliation." Doc. 48 at 11. While Mr. Nehemiah's petition is rambling and nearly unintelligible,

one of his clearer allegations ascribes a retaliatory intent to OPM's charge that he falsified his

application. *See* Doc. 37 at 2–3 ("The Office of personnel Management with the deliberate

deception of the Department of Veterans Affairs is trying to represent to the District court that the

petitioner falsified his resume. . . . This is a clear, cautious and unadulterated schematic (sic) of

retaliation.").  As to the negative suitability determination itself, it stands to reason that a recommendation that an employee be terminated would deter a reasonable employee from engaging in protected opposition.  *See Toth v. Gates Rubber Co.*, No. 99-1017, 2000 WL 796068, at *9 (10th Cir. 2000) (finding that negative evaluations which result in termination are adverse employment actions).  Thus, Mr. Nehemiah may have adequately pled this second element.

Mr. Nehemiah's retaliation claim, however, fails on the third element.  To plead the third and final element of a retaliation claim, a plaintiff must plausibly allege a causal connection between their protected opposition and the materially adverse action.  *McNellis*, 116 F.4th at 1142.  In other words, Mr. Nehemiah must plausibly allege that at least one of his three instances of protected opposition is causally connected to OPM's decision to issue a negative suitability determination.  "A causal connection can be inferred from the fact that the challenged action closely follows the employee's protected activity," and temporal proximity as close as a month, "alone, is sufficient to allow an inference of the existence of a causal connection between the two events."  *PVNF, L.L.C.*, 487 F.3d at 804 (noting that a month, twenty-four days, and six weeks between protected activity and a challenged action gives rise to an inference of causation); *see also Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding that a three-month period by itself is insufficient to infer causation).

The VA first referred Mr. Nehemiah's matter to OPM for governmentwide debarment on January 10, 2022, OPM assumed jurisdiction over the matter on March 16, 2022, OPM notified Mr. Nehemiah of the falsification charges on October 5, 2022, and OPM issued a final determination letter on April 27, 2023.  Doc. 80-2 at 1087–88.  Mr. Nehemiah's first two instances of opposition occurred during his employment with the Census Bureau.  *See* Doc. 37 at 7.  However, Mr. Nehemiah's employment with the Census Bureau ended in 2018, several years

before OPM even assumed jurisdiction over Mr. Nehemiah's case.  Doc. 80-2 at 1085–88.  These events are too temporally remote to give rise to an inference of causation.  *See Richmond*, 120 F.3d at 209.

Mr. Nehemiah's most recent alleged instance of protected opposition—his email to management and contact with the EEOC—occurred on June 8, 2022, several months *after* the VA first referred Mr. Nehemiah's matter to OPM and OPM assumed jurisdiction over the matter. *See* Doc. 80-2 at 398–99, 1087–88; *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1226 (10th Cir. 2016) (holding that the plaintiff "cannot establish the requisite causal connection between his protected activity and the adverse employment action" where the adverse action takes place before the protected activity occurred).  Further, the email was sent over ten months before OPM issued the final determination letter that Mr. Nehemiah is challenging.  This instance is again too remote to give rise to an inference of causation by itself.  *See Richmond*, 120 F.3d at 209 (affirming that a three-month period between protected activity and adverse action by itself is insufficient to infer causation).

Even where the protected conduct is not closely followed by the adverse action, retaliation may still be inferred where a pattern of retaliatory activity begins soon after the protected conduct.  *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).  Here, Mr. Nehemiah does not allege a pattern of retaliation by OPM after he sent the email.  Nor does Mr. Nehemiah allege that OPM prompted any other adverse employment actions after he sent the email.  He remained employed with the VA until OPM completed its investigation, and he does not allege that he was written up, demoted, or suffered some other adverse employment action during that time.  *See Marx*, 76 F.3d at 329 (finding allegations of a write up and demotion

before eventual termination to constitute a pattern of retaliatory conduct that precluded summary judgment in favor of an employer).

Thus, while Mr. Nehemiah may have adequately pled the first two elements of a Title VII retaliation claim, he has failed to plausibly allege a causal connection between his protected opposition and the materially adverse action OPM took against him.  I therefore recommend that the Court dismiss Mr. Nehemiah's Title VII retaliation claim without prejudice.

E.  <u>Mr. Nehemiah has not stated a plausible claim of discrimination under either the Americans with Disabilities Act or the Rehabilitation Act</u>.

Mr. Nehemiah raises a claim for relief under the Americans with Disabilities Act ("ADA").  The Americans with Disabilities Act ("ADA") prohibits a "covered entity" from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "covered entity" is "an employer," but the federal government is explicitly excluded as an employer subject to the ADA.  42 U.S.C. § 12111(2), 5(B)(i); *Brown v. Austin*, 13 F.4th 1079, 1084 n.3 (10th Cir. 2021).

The sole defendant in this case is an entity of the federal government, OPM, and is not subject to the ADA.  The Rehabilitation Act—not the ADA—prohibits federal executive agencies from discriminating against employees and job applicants based on disability.  *See* 29 U.S.C. § 794.  But Mr. Nehemiah's petition only mentions the ADA.  *See generally* Doc. 37 at 19. Nonetheless, because employment discrimination claims brought under the ADA and the Rehabilitation Act are governed by the same substantive standards, *Cline v. Clinical Perfusion Sys., Inc.*, 92 F.4th 926, 931 (10th Cir. 2024), I will construe Mr. Nehemiah's ADA claim as a Rehabilitation Act claim.  *See Brown*, 13 F.4th at 1084 n.3; *Padilla v. Mnuchin*, 836 F. App'x

674, 677 n.1 (10th Cir. 2020) (liberally construing a pro se plaintiff's ADA claims as

Rehabilitation Act claims where the plaintiff was a federal employee excluded from coverage

under the ADA).

To state a claim under Section 504 of the Rehabilitation Act, Mr. Nehemiah must plead

"(1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the

position, (3) that he was discriminated against solely by reason of his handicap, and (4) that the

program or activity in question receives federal financial assistance." *Cline*, 92 F.4th at 932

(citation modified) (quoting *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th

Cir. 2011)).

Mr. Nehemiah states that at the time he certified that all of the information in his

application was correct, he "was struggling with long term Dyslexia, PTSD and Brain Trauma"

and "as a result [he] membered (sic) what his mind allowed him to remember." Doc. 37 at 6.

Mr. Nehemiah explains that "PTSD can significantly affect a person's memory" and "can lead to

memory gaps and challenges with everyday memory functions as well." *Id.* He further states

that if he "could remember the information that was asked of him then he would have answered

yes and explained the situation," and that OPM "could have done a follow up question and

answer with" him. *Id.* at 7. He further states that the ADA "is meant to level the playing field

for people with disabilities, including those who are dyslexic." *Id.* Mr. Nehemiah then goes on

to describe his prior employment at the Census Bureau. He does not connect his statements back

to his ADA claim. *See id.* at 7–10. Mr. Nehemiah refers to the ADA a few more times in his

petition, but only in statements wholly unconnected to the facts of his case:

> The Supreme Court ruled in favor of Mr. Perez in a 9-0 decision. The case will
> now return to the federal district court for the Western District of Michigan, where
> Mr. Perez will have the chance to prove his ADA claim. The Supreme Court's
> decision means that across the United States, students with disabilities can now

pursue federal claims requesting relief not available under the IDEA, like money damages, without needing to exhaust IDEA's administrative remedies.

Doc. 37 at 9.

Mr. Nehemiah appears to allege that his disabilities are "long term Dyslexia, PTSD and Brain Trauma." Doc. 37 at 6. He also appears to suggest that he falsely certified that the information in his job application was accurate because his disabilities prevented him from remembering certain information he was required to disclose on the application. *See id.* at 7. These statements do not explain how Mr. Nehemiah's disabilities factored into any action OPM took towards him, nor is there any allegation that OPM even knew of Mr. Nehemiah's alleged disabilities. *See Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 991 (10th Cir. 2021) (holding that an employee did not demonstrate her termination was because of her disability where the employee failed to show that her employer knew of her disability). At most, these statements serve as an explanation for why Mr. Nehemiah included false information on his application, but they do not explain how OPM discriminated against him because of his disabilities. Mr. Nehemiah just concludes that OPM is penalizing him for his disabilities in not allowing him to explain why he made a false statement on his application. Doc. 37 at 7. These allegations are simply too conclusory to state a plausible claim. *See Ashcroft*, 556 U.S. at 678.

In summary, I recommend that the Court liberally construe Mr. Nehemiah's ADA claim as a claim under the Rehabilitation Act, but I also recommend that the Court find that Mr. Nehemiah has failed to state a plausible claim for relief under the Rehabilitation Act. Accordingly, I recommend that the Court dismiss Mr. Nehemiah's Rehabilitation Act claim without prejudice.

**CONCLUSION**

For the foregoing reasons, I recommend that the Court GRANT OPM's Motion to Dismiss (Doc. 48).  I recommend that the Court find that Mr. Nehemiah has abandoned any appeal of the MSPB action; accordingly, this matter should no longer proceed as a "mixed case" and instead solely as an employment discrimination case.  I further recommend that the Court dismiss Mr. Nehemiah's Title VII discrimination and retaliation claims without prejudice; although OPM requests dismissal with prejudice, it has not demonstrated that granting Mr. Nehemiah leave to amend his complaint would necessarily be futile.  *See Brereton*, 434 F.3d at 1219.  I also recommend that the Court construe Mr. Nehemiah's ADA claim as a claim under the Rehabilitation Act and dismiss that claim without prejudice.

Should the Court adopt these recommendations, I further recommend that the Court allow Mr. Nehemiah thirty (30) days in which to file a motion for leave to file an amended complaint raising his discrimination and retaliation claims.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 n.3 (10th Cir. 1991) ("[P]ro se litigants are to be given reasonable opportunity to remedy the defects in their pleadings.").  Mr. Nehemiah shall attach his proposed amended complaint as an exhibit to the motion.  *See* D.N.M.LR-Civ. 15.1 ("A proposed amendment to a pleading must accompany the motion to amend.").  The proposed amended complaint should be no longer than 20 double-spaced pages and comport with the Federal Rules of Civil Procedure and the Local Rules of Civil Procedure for the U.S. District Court for the District of New Mexico ("Local Rules").[12]  The

---

[12] For example, the Federal Rules of Civil Procedure require parties to state "a short and plain statement of the claim showing that the pleader is entitled to relief" along with "a demand for the relief sought."  FED. R. CIV. P. 8(a)(2)–(3).  Further, a party's claims must be "in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  FED. R. CIV. P. 10(b).  The Local Rules provide that "the text of all documents must be double spaced," D.N.M.LR-Civ. 10.1.

District of New Mexico provides a webpage with resources for pro se litigants that Mr. Nehemiah may find helpful.[13]  Additionally, the docket does not reflect that the District's Guide for Pro Se Litigants has been sent to Mr. Nehemiah, and I direct the Clerk of the Court to mail the Guide for Pro Se Litigants to him.

Mr. Nehemiah is warned that failure to comply with these requirements may result in denial of the motion and dismissal of his case.  Further, Mr. Nehemiah is warned that "[w]hen a pro se litigant files complaints that are repetitive, duplicative of other filings, without merit, or frivolous, he abuses the district court process," *Childs v. Miller*, 713 F.3d 1262, 1265 (10th Cir. 2013), and his ability to file documents may be restricted.  Mr. Nehemiah has filed approximately 50 documents since filing his Petition, most of which are nonsensical.  I recommend that the Court place filing restrictions on Mr. Nehemiah if he continues to abuse his filing privileges.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **Written objections must be both timely and specific.** *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  Failure to file timely and specific objections will result in waiver of** *de novo* **review by a district or appellate court.** *Id.*  **In other words, if no objections are filed, no appellate review will be allowed.**

---

Laura Fashing
U.S. Magistrate Judge

---

[13] The webpage is available here: https://www.nmd.uscourts.gov/representing-yourself-pro-se.